Henry C. Minchin v. Commissioner.
Minchin v. Comm'r
Docket No. 77784.
United States Tax Court
T.C. Memo 1963-111; 1963 Tax Ct. Memo LEXIS 235; 22 T.C.M. (CCH) 517; T.C.M. (RIA) 63111; April 17, 1963
*235 Held, amounts of purported "interest" paid by petitioner with respect to so-called "loans" on certain single-premium deferred payment annuity contracts are not deductible interest under section 23(b) of the 1939 Code and section 163(a) of the 1954 Code. Knetsch v. United States, 364 U.S. 361 (1960), followed. Israel Machtey, Esq., 23 W. Putnam Ave., Greenwich, Conn., for the petitioner. Douglas D. Robertson, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent *236 determined deficiencies in petitioner's income taxes for the calendar years 1953 and 1954 in the respective amounts of $16,996.74 and $16,804.55. The question presented for decision is whether petitioner is entitled to deduct, as interest under sections 23(b) of the 1939 Code and 163(a) of the 1954 Code, amounts paid with respect to certain alleged "loans" made on the security of two single-premium defered payment annuity contracts. Findings of Fact Petitioner is an individual residing in Greenwich, Connecticut. He filed Federal income tax returns on the cash receipts and disbursements method of accounting for the taxable calendar years 1953 and 1954 here involved, with the district director of internal revenue at Hartford. On May 20, 1953, petitioner was a widower, 62 years of age, owning listed marketable securities with a fair market value of $692,299.79, against which he owed a margin debt of $377,114.32. On the same date of May 20, 1953, the Commercial Benefit Insurance Company (hereinafter called "Commercial"), of Phonix, Arizona, issued to petitioner two singlepremium deferred payment annuity contracts, numbered DA 39 and DA 40. The contracts were identical as to their *237 terms; and each provided, in substance and so far as here material, as follows: For a recited consideration of $200,000, Commercial agreed to pay petitioner (called in the contract, "the annuitant") 120 monthly payments of $2,408 each, beginning on the "retirement date" which was 10 years after the date of issue (May 20, 1953). If petitioner should die after the retirement date, but prior to receiving all the 120 monthly payments, then the remaining unpaid monthly payments were to be made to the beneficiary named in the contract, which was petitioner's son. The cash values of the contract at the several anniversary dates prior to the retirement date were set forth in a table, and they were as follows: Years to
Years to
Retirement
Cash
Retirement
Cash
Date
Value *
Date
Value *
10
$830.54
5
$ 951.20
9
853.38
4
977.37
8
876.85
3
1,004.24
7
900.96
2
1,031.86
6
925.74
1
1,060.24
Prior to the retirement date, the annuitant could, upon "written assignments and upon the sole security of this contract," borrow an amount not to exceed the cash value at the retirement date at *238 the rate of interest and payable in the manner specified in a loan agreement which was to be executed upon the making of such a loan. All annuity payments falling due while a loan was outstanding against the contract were to be applied to the payment of interest and principal on the loan. About 7 weeks after annuity contracts DA 39 and DA 40 were issued to petitioner, on July 7, 1953, petitioner gave to Commercial two demand negotiable promissory notes in the amount of $200,000 each, as consideration for the issuance to him of said annuity contracts. And on the same day, he executed and delivered to Commercial two instruments, each captioned "Contract Loan Agreement," under each of which petitioner purported to borrow from Commercial $211,151.25, with interest at 4 percent per annum, for the 2-year period May 20, 1953-1955. Concurrently with the execution and delivery of said loan agreements, petitioner assigned annuity contracts DA 39 and DA 40 to Commercial as sole security for Commercial's "loans" to him. The cash value of each of the annuity contracts here involved, would have been $211,145.48 on May 20, 1955, the maturity dates of the above-mentioned "loans" of $211,151.25 *239 each. On or about July 20, 1953, Commercial marked each of petitioner's $200,000 notes "Paid" and returned the same to him. Concurrently, the company deposited $22,302.50 ($11,151.25 with respect to each annuity contract) in a newly-opened bank account of petitioner's in the Valley National Bank at Phoenix. On the same date petitioner issued two checks to Commercial, in the amount of $15,930.05 each (total, $31,860.10), drawn on the same Valley National Bank account, in payment of purported "interest" on the "loans," to May 20, 1955. On his Federal income tax return for 1953, petitioner deducted said amount of $31,860.10 as interest. At some time prior to December 20, of the immediately succeeding year 1954, all of Commercial's rights and liabilities under annuity contracts DA 39 and DA 40 were assumed by another company, United Guaranty Life Society (hereinafter called "United"). Petitioner, on December 20, 1954 (which was 5 months prior to the time when the above-mentioned 1953 "loans" were to mature), executed two new "Contract Loan Agreements" with United. These loan agreements were similar to the 1953 loan agreements, but they did differ in three respects: (1) Instead *240 of interest at a straight rate of 4 percent, the 1954 agreements provided for interest at 4 percent per annum, discounted at 4 percent per annum; (2) a gradually decreasing rate of interest was provided for after the sixth year; and (3) the annuitant was given the right to suspend payment of interest to the company, except to the extent of one-sixteenth of 1 percent per annum, provided that he would agree that the cash value of the annuity need not be increased during the period of suspension. Each of the 1954 loan agreements was in the amount of $222,750; it bore interest at the discounted 4 percent rate above mentioned; and it was for the 2-year 5-month period of December 20, 1954, to May 20, 1957. Petitioner's annuity contracts continued to be the sole security for the "loans." Repeating the pattern of the 1953 loan agreement transaction, United on or about December 28, 1954, cancelled petitioner's 1953 loan agreements of $211,151.25 each, and deposited to the credit of petitioner's account at the Valley Bank, $23,197.50 ($11,598.75 with respect to the loan agreement on each contract, and being the difference between $222,750 and $211,151.25). And petitioner, likewise following *241 the 1953 pattern, thereupon on the same date, delivered to United two checks drawn on his Valley Bank account, in the amount of $17,575.04 each (total, $35,150.08) in payment of purported "interest" on the "loans" for 2 years and 5 months, to May 20, 1957. Shortly thereafter, United determined that the "interest" so paid was excessive to the extent of $369, and it refunded such amount to petitioner. The cash value of each of the anuity contracts here involved, would have been $222,918.19 on May 20, 1957, the maturity dates of the above-mentioned "loans" of $222,750 each. At December 31, 1954, petitioner owned listed marketable securities having a fair market value of $1,406,917.12, against which there was a margin debt of $614,274.62. Petitioner, on his Federal income tax return for 1954, deducted, as interest, the net amount which he paid to United in said year in the manner above described, viz., $34,781.08 ($35,150.08, less $369 refunded). Petitioner on his Federal income tax returns for 1953 and 1954, reported adjusted gross incomes and income taxes due thereon as follows: 1953
1954
Adjusted gross income
$54,443.82
$61,017.83
Income tax due thereon
1,452.61
1,348.13
*242 Respondent, upon audit of petitioner's returns for 1953 and 1954, disallowed deductions for the amounts paid by petitioner in those years to Commercial and United, respectively. Prior to the time when petitioner purchased annuity contracts DA 39 and DA 40, he consulted with his attorney and tax counsel relative to the advisability of such contemplated action. In the course of such consultation, the attorney showed to petitioner copies of 11 letters (10 signed by a deputy commissioner of internal revenue, and 1 by the head of the technical rulings division of the Internal Revenue Service), which were written on various dates between October 16, 1947, and November 6, 1952, in which it was stated that interest paid under circumstances somewhat similar to those under which petitioner paid the "interest" involved herein, was deductible for Federal income tax purposes. None of said rulings was addressed to the petitioner; nor was any of said rulings ever published by the Internal Revenue Service in the Internal Revenue Bulletin, the Cumulative Bulletins, or elsewhere. Opinion The Supreme Court, in the comparatively recent case of Knetsch v. United States, (Nov. 14, 1960) 364 U.S. 361, *243 held that interest deductions were not allowable, in respect of amounts paid by the taxpayer to an insurance company on "loans" made to purchase from said company single-premium annuity savings bonds. We think that the decision in the Knetsch case controls the decision in the instant case. The taxpayer in the Knetsch case followed a pattern remarkably similar to that followed by petitioner here. The transactions are described with particularity by the Supreme Court in its opinion; and we will not repeat them. Suffice it to say that Knetsch gave promissory notes for the great bulk of the purchase price of the bonds ($4,000,000 in notes, out of $4,004,000 total purchase price); prepaid "interest" thereon at the rate of 3 1/2 percent for 1 year; immediately borrowed the difference (less $1,000) between his "indebtedness" and the greater cash or loan value that the bonds would have had at the end of said year; prepaid "interest" for 1 year on this new "loan"; and deducted the sum of such "interest" payments on his Federal income tax return for 1953. Then in 1954, he prepaid "interest" on his "loan" for 1 further year; borrowed the difference (less $1,000) between his then "indebtedness" *244 and the increased cash or loan value that the bonds would have had at the end of the second year; prepaid the "interest" for a year on this new "loan"; and deducted the 1954 "interest" payments on his 1954 return. In holding that the "interest" payments were not deductible the Supreme Court stated, in part, as follows: We first examine the transaction between Knetsch and the insurance company to determine whether it created an "indebtedness" within the meaning of § 23(b) of the 1939 Code and § 163(a) of the 1954 Code, or whether, as the trial court found, it was a sham. * * * When we examine "what was done" here, we see that Knetsch paid the insurance company $294,570 during the two taxable years involved and received $203,000 back in the form of "loans." What did Knetsch get for the out-of-pocket difference of $91,570? In form he had an annuity contract with a so-called guaranteed cash value at maturity of $8,388,000, which would produce monthly annuity payments of $90,171, or substantial life insurance proceeds in the event of his death before maturity. This, as we have seen, was a fiction, because each year Knetsch's annual borrowings kept the net cash value, on which any *245 annuity or insurance payments would depend, at the relative pittance of $1,000. n3 Plainly, therefore, Knetsch's transaction with the insurance company did "not appreciably affect his beneficial interest except to reduce his tax…" Gilbert v. Commissioner, 248 F. 2d 399, 411 (dissenting opinion). For it is patent that there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction. What he was ostensibly "lent" back was in reality only the rebate of a substantial part of the so-called "interest" payments. The $91,570 difference retained by the company was its fee for providing the facade of "loans" whereby the petitioners sought to reduce their 1953 and 1954 taxes in the total sum of $233,297.68. There may well be single-premium annuity arrangements with nontax substance which create an "indebtedness" for the purposes of [Footnote 3 omitted.] § 23(b) of the 1939 Code and § 163(a) of the 1954 Code. But this one is a sham. [4]
*246 Despite certain minor surface distinctions between the Knetsch case and the instant case (such as, for example, annuity savings bonds were involved there, while here there were annuity contracts), we think that in substance the two cases are not distinguishable. Petitioner has made strenuous efforts to show nontax substance in the case at bar, arguing that his purpose in acquiring the annuity contracts was to keep himself from becoming a burden to his children, and that he was delaying actual payments for the contracts until the retirement date, so that he could make payment in the cheaper dollars that would be available at said retirement date (that is to say, dollars made less valuable by the inroads of inflation in the nation's economy). We think the arguments are makeweights. In the first place, a person of petitioner's substantial financial means could have no serious fear of becoming a burden to his children (the net fair market value of his listed marketable securities at December 31, 1954, was almost $800,000). And in the second place, petitioner in reality secured no protection, for the "loans" on the contracts were approximately equal to their cash or loan value during *247 the period involved in the instant case; and the annuity contracts provided that any annuity payments becoming due while a loan was in force, should be first applied to the interest and principal on said loans. We are persuaded that the only thing of substance that petitioner could derive from the transactions here involved was a tax deduction, just as the Supreme Court found with respect to Knetsch. So eager was petitioner for his interest deduction, that, in December 1954, 5 months before his 1953 "loans" were to mature, he negotiated new loan agreements. The only discernible purpose that we can discern for this premature action was to manufacture an interest deduction for 1954. On the authority of the Knetsch case and the authorities cited by the Court in its footnote 4 therein, as well as on the authority of more recent cases decided by this Court, William R. Lovett, 37 T.C. 317, Amor F. Pierce, 37 T.C. 1039, and A. A. Helwig, 37 T.C. 1046, we hold that the payments of so-called "interest," made by petitioner to Commercial and United during the years 1953 and 1954, do not qualify for deduction under section 23(b) of the 1939 Code or section *248 163(a) of the 1954 Code. Petitioner presses upon us the further argument, that even if the payments involved be held not deductible under the statutes, he should nevertheless be allowed them, on the basis of his reliance upon the unpublished letter-rulings of the respondent, issued to taxpayers other than petitioner, which were shown to petitioner by his attorney and tax counsel before he entered the annuity transactions involved in the instant case, and in which it was held that "interest" payments made in circumstances somewhat similar to those present in the instant case were deductible for Federal income tax purposes. Petitioner asserts that it was an abuse of discretion for respondent to make a contrary determination in the instant case. There is no merit to petitioner's argument. The Supreme Court has held that it is not an abuse of discretion to revoke retroactively a ruling issued to a particular taxpayer, in a case involving the very taxpayer to whom the ruling was issued. Automobile Club of Michigan v. Commissioner, 353 U.S. 180. A fortiori, there is no abuse of discretion where the Commissioner changes the position which he had taken in earlier, unpublished *249 rulings, issued to taxpayers other than the one with respect to whom the changed position is to be applied. And that is exactly what happened in the instant case. See also Helvering v. New York Trust Co., 292 U.S. 455, where the Court stated: The [published] rulings * * * "have none of the force or effect of Treasury Decisions and do not commit the [Treasury] Department to any interpretation of the law." Decision will be entered for the respondent. Footnotes
*. Cash values are stated in terms of a $10 annuity.↩
4. Every court which has considered this or similar contracts has agreed with our conclusion, except the Court of Appeals for the Fifth Circuit in the Bond case and one District Court bound by that decision, Roderick v. United States,. See Diggs v. Commissioner, 281 F. 2d 326 (C.A. 2d Cir.), pending on petition for certiorari (later denied, post, p. 908); Emmons and Weller v. Commissioner, 270 F. 2d 294 (C.A. 3d Cir.), pending on petitions for certiorari (later denied, post, p. 908); Haggard v. United States, Oliver L. Williams, 18 T.C.M. 205. See also Rev. Rul. 54-94, 1954-1 Cum. Bull. 53↩, and the dissenting opinion of Judge Wisdom in Bond.